# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

## Case No. 6:18-cv-223-Orl-28KRS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE
FARM FIRE AND CASUALTY COMPANY,

     Plaintiffs,

vs.

FAMILY PRACTICE AND REHAB, INC.,
and GILSON MORTIMER,

     Defendants.

_____/

## PLAINTIFFS' MOTION FOR FINAL SUMMARY JUDGMENT
## AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY ("State Farm Mutual") and STATE FARM FIRE AND CASUALTY COMPANY ("State Farm Fire") (collectively, the "Plaintiffs"), by counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 3.01, hereby file their Motion for Final Summary Judgment and Incorporated Memorandum of Law against Defendant, GILSON MORTIMER ("Mortimer"), and state as follows:

## BACKGROUND FACTS

This lawsuit arises out of a fraudulent clinic-ownership scheme which was orchestrated to, and in fact did, induce Plaintiffs into paying Defendants, FAMILY PRACTICE & REHAB, INC. ("Family Practice") and GILSON MORTIMER ("Mortimer"), over $380,000.00 in personal injury protection ("PIP") and medical payments ("MPC") benefits for unlawful and non-compensable

chiropractic treatment. To carry out his scheme, Mortimer convinced a medical professional, Charles Richard, D.O. ("Dr. Richard"), to pose as the "owner" of Family Practice in order to circumvent Florida's healthcare clinic licensing requirements.[1] (Dkt. 1-2, Ex. C, ¶s 3-6) In reality, Mortimer, who was not authorized under Florida law to own a healthcare clinic, owned some or all of Family Practice.[2] (Mortimer Dep. 13:8-14:2, March 12, 2019)

It is undisputed that Family Practice opened as a chiropractic clinic in 2012 in Orlando, Florida. (Mortimer Dep. 20:10-21:3, March 12, 2019) All of the State Farm Mutual and State Farm Fire insureds who treated there paid for their care through an assignment of benefits under policies of automotive insurance issued by Plaintiffs. From its inception, the undisputed evidence shows that Mortimer owned some or all of Family Practice. For example, Mortimer was originally listed as Vice President on the corporate filings for Family Practice. (Mortimer Dep., Ex. 2, March 12, 2019) Mortimer did almost everything to get the clinic up and running. Mortimer found the office space, negotiated the lease agreement, secured all of Family Practice's furnishings and equipment, obtained and prepared all of the necessary license applications, found and hired all the employees, found and retained the vendors, retained legal counsel, hired accountants, hired Family Practice's billing company, and set the office policies and procedures. (Mortimer Dep. 22:9-23:6, 32:8-34:19, 37:18-40:20, 42:8-43:8, March 12, 2019) Mortimer also handled general payroll issues, the clinic's marketing, banking issues, billing issues, and legal issues. (Mortimer Dep. 33:6-34:7, 37:18-40:20, 42:8-43:8, 65:7-20, 69:6-10, 70:9-20, 112:20-22, March 12, 2019) Mortimer managed the business, ran all of the day-to-day operations of

---

[1] A true and correct copy of both of Dr. Richard's Affidavits are attached as Exhibit "A."
[2] A true and correct copy of the deposition transcript of Mortimer is attached hereto as Exhibit "B." When applicable, the specific exhibit to the deposition transcript is noted.

Family Practice, and even treated patients. (Mortimer Dep. 32:8-34:19, 35:8-36:1, March 12, 2019)

The undisputed evidence also shows Mortimer received the majority of the financial benefit from Family Practice's operations. The financial records indicate that there were several payments, checks, and debit card transactions to Mortimer, his family, and his other business entities totaling over $270,000.00 (which is more than ten times the amount of money paid to Dr. Richard). (Mortimer Dep. Ex. 39-40, March 12, 2019 ) As evidence of Mortimer's control over Family Practice's finances, the record evidence shows that he frequently issued checks to himself, his wife, and his other businesses for amounts ranging from $4,000.00 to $15,000.00 and made electronic deposits from Family Practice's checking account directly into his personal account (Mortimer Dep. 48:6-57:24, 58:22-62:23, Ex. 12, 13, 14, 16, March 12, 2019) Mortimer frequently used his Family Practice debit card for personal use, and used Family Practice money to pay for his personal vehicle. (Mortimer Dep. 94:17-95:7, 105:2-109:13, 111:11-112:4, Ex. 31, 36, March 12, 2019) Most compelling, Mortimer withdrew over $1,200,000.00 in cash from Family Practice's bank account and authorized a wire transfer of money from Family Practice's checking account to purchase an office building titled in his own name. (Mortimer Dep. 81:6-84:9, 125:22-130:23, Ex. 26, 27, 28, 39, 40, March 12, 2019)

Simply put, Mortimer, who lived in Kissimmee, maintained control over Family Practice's finances, ran all of the day-to-day activities, fully controlled its internal and external operations, and received a significant financial benefit from its existence that was much greater than the alleged "owner." By contrast, Dr. Richard, the purported owner, lived in West Palm Beach, only executed certain documents identifying himself as the owner, did not even have a

key to the clinic, was not involved in any day-to-day activities, only visited the clinic once or twice a month, and only received a small amount of money from the clinic as a W-2 employee. (Dkt. 1-2, Ex. C, ¶s 12, 14-16; Mortimer Dep. 20:10-25, 32:8- 34:19, 48:16-49:2, March 12, 2019)

Plaintiffs' Complaint asserts claims for common law fraud, unjust enrichment, and declaratory relief based on the above described unlawful ownership scheme at Family Practice. (Dkt. 1)  The Clerk previously entered a Default Judgment against Family Practice. (Dkt. 16) Plaintiffs now seek Final Judgment against Mortimer and Family Practice on their claims for fraud, unjust enrichment, and declaratory relief.

## ARGUMENT

"Summary judgment is proper when the evidence, viewed in the light most favorable to the non-moving party, presents no genuine issues as to any material fact and compels judgment as a matter of law." *Findwhat Investor Group v. Findwhat.com*, 658 F. 3d 1282, 1307 (11th Cir. 2011).  "A fact is "material" if it may affect the outcome of the suit under governing law." *Price v. Dist. Sch. Bd. of Collier County, Fla.*, 2013 WL 3815594, at *1 (M.D. Fla. July 22, 2013) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*  However, "[a] mere scintilla of evidence in support of the non-movant is insufficient to defeat a motion for summary judgment." *Holloway v. City of Orlando*, 2016 WL 4369958, at *3 (M.D. Fla. Aug. 16, 2016) (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986)). "To defeat a motion for summary judgment, the non-moving party must 'go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists.'"

*Id.* (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). Here, there is no genuine issue of material fact, Dr. Richard never "wholly owned" Family Practice and all of the services rendered were unlawful.

I. **FAMILY PRACTICE WAS NOT PROPERLY LICENSED AND THEREFORE OPERATED UNLAWFULLY BECAUSE IT WAS NOT "WHOLLY OWNED" BY DR. RICHARD.**

Under Florida law, healthcare clinics are required to obtain a license pursuant to Florida's Health Care Clinic Act, sections 400.990 – 995, Florida Statutes (2017) (the "HCCA"), unless they can prove to be exempt. Rather, than obtain a proper license, Mortimer used Dr. Richard to pose as the "owner" of Family Practice in order to secure an exemption from the HCCA's clinic-licensure requirements. However, as will be shown below, Mortimer had an ownership interest in Family Practice. Accordingly, because Dr. Richard did not "wholly own" Family Practice, Family Practice was not properly exempt from the HCCA's licensure requirements, and all of Family Practice's treatment rendered to Plaintiffs' insureds was unlawful and non-compensable.

A. <u>**Florida's Healthcare Clinic Licensure Requirements**</u>.

The HCCA requires that all healthcare clinics be licensed by the Agency for Health Care Administration ("AHCA") to provide medical treatment and services, unless they qualify for a specific exemption to licensure. *See* §400.990 – 995, Fla. Stat. (2012). The intent behind the HCCA is to require "licensure, establishment, and enforcement of the basic standard for healthcare clinics," and to provide administrative oversight by the AHCA. § 400.990(2), Fla. Stat. (2012). The HCCA also incorporates the licensure requirements of the Health Care Clinic Licensing Procedures Act, Fla. Stat. §§ 408.801, *et seq.* (the "Licensing Act"), which states that "[u]nlicensed activity constitutes harm that materially affects the health, safety, and welfare of

clients." § 408.812(2), Fla. Stat. (2012). The Licensing Act also states that it is "unlawful to provide services that require licensure, or operate or maintain a provider that offers or provides services that require licensure, without first obtaining from the agency a license authorizing the provision of such services or the operation or maintenance of such provider." §408.804(1), Fla. Stat. (2012). *See also State Farm. Mut. Auto. Ins. Co. v. First Care Solution, Inc.*, 232 F. Supp. 3d 1257, 1266 (S.D. Fla. 2017).

While there are multiple limited exemptions to licensure under the HCCA, the specific exemption that is at issue in this matter is the "wholly owned" licensure exemption. Section 400.9905(4)(g) states that a clinic need not be licensed if it is "wholly owned by one or more licensed health care practitioners... who is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws." § 400.9905(4)(g), Fla. Stat. (2012). In order to maintain this exemption, a licensed health care professional must always be supervising the business activities and must maintain responsibility for compliance with all required laws. *Id. See also State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. Of Fla., Inc.*, 103 F. Supp 3d 1343, 1350 (S.D. Fla. 2015). As such, "ownership" of a healthcare clinic requires more than just mere title, but rather it requires active measures to oversee the clinic's operations. *See State Farm Fire & Cas. Co. v. Silver Star Health and Rehab,* 739 F. 3d 579, 585 (11th Cir. 2013) (finding that indicia of ownership include participation in management and control over the business); *Med. Serv. Ctr. Of Fla., Inc.,* 103 F. Supp. 3d. at 1350-51 (stating that the owner of a clinic has the continuing obligation to supervise the daily activities and ensure compliance with all laws). Section 627.736(5)(h), Florida Statutes, provides additional licensing requirements in order to receive reimbursement under the No-Fault Law. Specifically, only

6

entities that are "wholly owned" by a physician licensed under chapter 458 or 459, a dentist licensed under chapter 466, or a chiropractic physician licensed under chapter 460 qualify for the "wholly owned" exemption. *See* § 627.736(5)(h), Fla. Stat. (2012).

**B.** **Family Practice was never "wholly owned" by Dr. Richard, and all treatment rendered by Family Practice was unlawful and non-compensable.**

As indicated above, the HCCA allows healthcare clinics to be exempt from the mandatory licensure requirements if they are "wholly owned by one or more licensed healthcare practitioners." *See* § 400.9905(4)(g), Fla. Stat. (2012). Section 627.232(17), Florida Statutes, defines the term "wholly owned" as an entity that "provides health care services rendered by licensed health care practitioners and in which licensed health care practitioners are the business owners **of all aspects of the business entity**, including, but not limited to, being reflected as the business owners on the title or lease of the physical facility, filing taxes as the business owners, being account holders on the entity's bank account, being listed as the principals on all incorporation documents required by this state, and having ultimate authority over all personnel and compensation decisions relating to the entity." (emphasis added).

In addition to the statutory requirements, several courts have opined on the issue of what it means for a clinic to be "wholly owned." The Eleventh Circuit in *Silver Star* stated that factors to determine whether or not a licensed health care practitioner "wholly owns" a healthcare clinic include the extent of any investments in the business, the right to profit from the business, the risk of loss from the business, and participation in the management and control of the business operations. *Silver Star*, 739 F. 3d 579 at 585. The court stated that "no single factor is necessarily more significant" and all factors should be taken as a whole. *Id.*

In *Med. Serv. Ctr. Of Fla., Inc.,* the court identified several factors which should be considered indicia of ownership, including possessing keys to the clinic, owning the equipment used in the clinic, control of financial accounts, authority to retain counsel and accountants, control of payroll, control of office policies and procedures, control over HR decisions, and involvement in the day-to-day business operations. *Id.* 103 F. Supp. 3d 1343 at 1351 (referencing *Allstate Ins. Co. v. Schleub*, 19 Fla. L. Weekly Supp. 561b (Fla. 9th Cir. Nov. 10, 2011)). The court, in weighing these factors, found that the purported owner did not satisfy the indicia of ownership, and as a result was not the true owner of the clinic. *Id.* In actuality, the evidence showed that a non-licensed layperson:

1. Wrote checks for personal bills from the clinic's bank account,
2. Wrote checks directly to herself and withdrew cash from the clinic's bank account,
3. Directed the activities of, and provided all the information to, the clinic's accountant,
4. Directed the activities of the clinic's attorney,
5. Sent money from the clinic's bank account to a separate entity owned solely in her name,
6. Used clinic credit cards to pay personal expenses,
7. Used a clinic owned car as her personal vehicle, and,
8. Maintained control over the day-to-day business operations of the clinic.

*Id.* at 1352. The court found that these factors indicated that the layperson, and not the licensed practitioner, was the true owner of the clinic, entitling State Farm to summary judgment on the issue. *Id.* at 1353.

Following the ruling in *Med. Serv. Ctr. Of Fla., Inc.,* another court again faced with a similar "wholly owned" exemption dispute. In *First Care Solution,* two licensed practitioners were, at separate times, listed on paper as the "owner" of the clinic. *First Care Solution*, 232 F. Supp. 3d 1257 at 1262-65. However, it was the layperson, and not the alleged "owners," who

handled the hiring and firing of employees, dealt with administrative fees, secured office equipment and furniture, possessed keys to the building, maintained control over the building, paid overhead expenses, retained legal counsel and made litigation decisions, retained accountants, handled marketing, and oversaw the day-to-day operations. *Id.* Further, the layperson had complete discretion over the financial accounts, made numerous cash withdrawals, wrote checks to himself, his wife, his family and other entities he owned, and signed more than 84% of the checks drawn on the clinics bank account. *Id.* Also, the layperson received approximately 10 times the amount of money as either of the alleged "owners." *Id.* The court found these factors determinative that the layperson was the true owner of the clinic, and thus the clinic did not qualify for the "wholly owned" exemption. *Id.* at 1268. As will be shown below, Mortimer's involvement with Family Practice is strikingly similar to the lay owners in *Med. Serv. Ctr. Of Fla., Inc*., and *First Care Solution* and Family Practice does not meet the statutory definition of a clinic "wholly owned" by a physician.

1. **No reasonable jury could conclude that Dr. Richard wholly owned Family Practice.**

All of the record evidence clearly shows that Dr. Richard did not "wholly own" Family Practice. Dr. Richard's Affidavits, the documentary evidence, and Mortimer's testimony show that:

    a. Dr. Richard did not invest any money into Family Practice. By contrast, Mortimer testified that he made undocumented loans to Family Practice to help pay for its operation, and wrote personal checks to Family Practice (Dkt. 1-2, Ex. C, ¶4-6; Mortimer Dep. 25:4-26:9, 62:24-64:1, Ex. 7, March 12, 2019; Mortimer Answers to Plaintiff's First Interrogatories ¶4);[3]

---

[3] A true and correct copy of Mortimer's Answers to Plaintiff's First Interrogatories are attached as Exhibit "C."

b. Dr. Richard did not own any of the furnishings or equipment, did not have a key to the office, and did not know the alarm code. Mortimer had keys to the clinic, obtained the furnishings and equipment, and maintained the patient files after Family Practice closed. (Dkt. 1-2, Ex. C, ¶s 14-16; Mortimer Dep. 32:8-34:19, 37:18-40:20, 42:8-43:8, 118:12-18, March 12, 2019);

c. Dr. Richard was not involved in the hiring or firing of any employees. All employment related decisions, worker's compensation applications, insurance policies, occupational licenses, scheduling, and other personnel related issues were handled by Mortimer. (Dkt. 1-2, Ex. C, ¶ 18; Mortimer Dep. 32:8-36:1, 37:18-40:20, March 12, 2019)

d. Dr. Richard never signed any checks drawn on Family Practice's bank account. Instead, Mortimer signed or stamped the checks for Family Practice and exercised complete control over Family Practice's financial accounts.[4] (Dkt. 1-2, Ex. C, ¶ 21; Mortimer Dep. 49:6-57:12, 58:6-21, 59:1-25, 100:6-101:13, Ex. 12-16, March 12, 2019);

e. Dr. Richard was paid by Mortimer and Mortimer determined the amount, rate, and frequency of pay. Dr. Richard only received a handful of payments, all of which were checks signed by Mortimer. (Dkt. 1-2, Ex. C, ¶12; Mortimer Dep. 58:6-21, Ex. 15, March 12, 2019);

f. Dr. Richard was not involved in paying taxes for Family Practice and did not retain, direct the activities of, or provide documents to any of Family Practice's accountants. The accountants were hired by Mortimer and he provided all documents, including balance statements, payroll documents, and profit and loss statements to the accountants. (Dkt. 1-2, Ex. C, ¶20, 28; Mortimer Dep. 84:17-85:6, 95:8-20, Ex. 31, March 12, 2019);

g. Dr. Richard did not retain or direct the activities of the attorneys filing PIP suits on behalf of Family Practice. Mortimer was in communication with Family Practice's attorneys and signed the majority of the closing statements on behalf of Family Practice. (Mortimer Dep. 65:4-20, Ex. 20-22, March 12, 2019);

h. Dr. Richard was not involved in the negotiation of letters of protection with attorneys for Insureds. Mortimer negotiated payments and settlements with attorneys for Insureds and signed settlement statements. (Mortimer Dep. 69:6-70:20, Ex. 23, March 12, 2019);

---

[4] Beginning on September 22, 2015, a stamp of Dr. Richard's signature was used for several remaining checks, including checks after Family Practice was purportedly sold by Dr. Richard.

i.  Dr. Richard never deposited checks for Family Practice, and was only allowed to use his assigned debit card upon permission from Mortimer. On the contrary, Mortimer was the primary user of the bank accounts, deposited all checks, withdrew large sums of cash, made the majority of all debit card purchases, and used his debit card for personal expenses. (Dkt. 1-2, Ex. C, ¶19, 21-22; Mortimer Dep. 48:6-57:24, 94:-95:7, 105:2-109:13, 111:11-112:4, Ex. 12-16, 39, 40, March 12, 2019);

j.  Dr. Richard was not involved in paying any vendors of Family Practice, and was not involved in payroll decisions relating to Family Practice's employees. Mortimer paid vendors, signed billing and service agreements for Family Practice, and paid all day-to-day and monthly expenses. (Mortimer Dep. 36:17-40:20, 42:8-43:8 Ex. 8-10, March 12, 2019);

k.  Dr. Richard was not involved in billing for treatment or services and had no involvement in determining the amounts to bill insurers. Mortimer arranged for a billing company, Equitable Services, to prepare all of Family Practice's billing and Mortimer signed the agreement with Equitable Services. (Dkt. 1-2, Ex. C, ¶s 25-28; Mortimer Dep. 112:20-114:13, Ex. 37, March 12, 2019)

l.  Dr. Richard was not involved in any of the day-to-day operations, implementation of office policies, oversight, and control of Family Practice (Dkt. 1-2, Ex. C, ¶s 17-18, 30-32). Dr. Richard's only duties with Family Practice were to provide patient examinations one day per month. (Dkt. 1-2, Ex. C, ¶s 9-10)

Also, when Family Practice started in 2012, it was Mortimer who secured the office space and negotiated lease agreements, secured all the furnishings and equipment for the clinic, obtained all necessary licenses, obtained insurance, opened the bank account, and hired all employees. (Mortimer Dep. 22:9-23:6, 32:8-34:19, 37:18-40:20, 42:8-43:8, March 12, 2019) Mortimer testified as follows regarding his control over Family Practice:

Q.  You arranged for the equipment to be delivered the clinic?
A.  Correct.
Q.  You arranged for the furniture and the computers to be delivered and set up, correct?
A.  Correct.
Q.  You had access to the bank accounts; correct?
A.  Correct.
Q.  You were a signer on the bank accounts?

A. Correct.

Q. You had a debit card, a charge card; correct?

A. Correct.

Q. All right. You were handling the hiring of employees; correct?

A. Correct.

Q. You were handling setting up the business, getting it licensed to operate; correct?

A. No.

Q. You weren't involved in that?

A. I mean part of it, yes.

Q. Okay. So you were involved in the licensing of the clinic; correct?

A. Correct.

Q. Even getting the occupational license; correct?

A. Correct.

Q. And so, during this time and the whole time you were office manager, you were in charge of the day-to-day operations of the clinic; correct?

A. Correct.

Q. You handled the marketing of the clinic?

A. Correct.

Q. You handled the scheduling of the employees, correct?

A. Yes.

Q. You even treated patients; correct?

A. Yes.

Q. I take it you managed the payroll as well, correct?

A. Yes. (Mortimer Dep. 32:8-34:7, March 12, 2019)

In addition, the evidence also shows that Mortimer:

a. Exercised complete control over Family Practice's checking account, including making the majority of the debit card related purchases, using the debit card to pay for personal items and expenses, making numerous cash withdrawals totaling over $1,200,000.00, and issuing several checks to himself, his family members, and other entities he owned (Mortimer Dep. 48:6-57:24, 58:22-62:23, Ex. 12, 13,14, 16, 39, 40, March 12, 2019 ;

b. Entered into contracts, service plans, and agreements for Family Practice with vendors, contractors, billing companies, accountants, and other service companies (Mortimer Dep. 36:17-40:20, 42:8-43:8 Ex. 8-10, March 12, 2019);

c. Signed over 90% of the closing statements sent to Family Practice by the law firm of Dos Santos & Shirazi, LLC, for money obtained through PIP suits filed on behalf of Family Practice (Mortimer Dep. 65:4-66:15), March 12, 2019); and,

d. Maintained control over Family Practice's patient files and records following the dissolution and purported sale of the clinic. (Mortimer Dep. 120:17-25, March 12, 2019)

Additionally, the banking records clearly demonstrate that Mortimer had an ownership interest in Family Practice. Mortimer was a signer on Family Practice's JP Morgan Chase bank account and was listed as Family Practice's Vice President on both the bank account forms and the Articles of Incorporation. (Mortimer Dep. 21:12-24, 29:18-30:15, Ex. 2-5, March 12, 2019) From that point forward, Mortimer signed or stamped every check drawn on Family Practice's account, including checks made out to himself, his family, and his other businesses as referenced above, until September 22, 2015, when he began using a stamp of Dr. Richard's signature. Mortimer negotiated and paid all vendor bills, made all deposits into Family Practice's checking account, paid all employees, paid the rent, and handled payment of all expenses. (Mortimer Dep. 36:17-40:20, 42:8-43:8, Ex. 8-10, March 12, 2019)

The financial records show that Mortimer, and his family, received the overwhelming majority of the profit from Family Practice's operations. Mortimer, his wife, Orabile Kobe-Mortimer ("Kobe-Mortimer"), and his business entities, Café Kreol & Bar Corp., GM Cleaning Services, Mail-N-Ship, LLC, received over $100,000.00 in payments made directly from Family Practice's checking account, compared to just $12,000.00 in payments made to Dr. Richard. (Mortimer Dep. Ex. 39-40, March 12, 2019) Additionally, Mortimer used his debit card to withdraw cash whenever he wanted, and to pay for personal items such as groceries, restaurants, payments for his personal car, and also at retail stores such as Guess, Victoria's Secret, auto parts stores, clothing stores, and other personal items. (Mortimer Dep. 94:17-95:7, 105:2-109:13, 111:11-112:4, Ex. 31, 36, March 12, 2019) When taken as a whole, Mortimer received

13

$277,839.24 in documented payments and money from Family Practice, compared to the $51,700.27 received or used by Dr. Richard. (Mortimer Dep. Ex. 39-40, March 12, 2019) Mortimer also used Family Practice funds to pay debts that were owed by his other businesses, as well as pay for his personal vehicle. (Mortimer Dep. 99:6-101:13, March 12, 2019) Finally, Mortimer withdrew over $1,200,000.00 in cash (for undocumented purposes) from Family Practice's checking account. (Mortimer Dep. 125:22-128:14 Ex. 39-40, March 12, 2019) In fact, it was not uncommon for Mortimer to withdraw $20,000.00 to $40,000.00 in cash from Family Practice's checking account on a monthly basis. (Mortimer Dep. 125:22-128:14 Ex. 39-40, March 12, 2019)

Another prime example of Mortimer's ownership of Family Practice is that in March, 2016, Mortimer authorized two wire transfers of $5,000.00 and $54,032.77 to purchase a piece of commercial property located at 1011 W. Oak Ridge Road, in Orlando, Florida. (Mortimer Dep. 81:6-84:9, Ex. 26, 27, 28, March 12, 2019) Mortimer **purchased and titled this property solely in his own name**. (Mortimer Dep. 81:6-84:9, Ex. 26, 27, 28, March 12, 2019) Mortimer now rents space to other businesses, including other chiropractic clinics. Mortimer also uses one of the suites as the location for another entity he operates known as M&G Healthcare Service, LLC. (Mortimer Dep. 83:20-84:16, Ex. 28, March 12, 2019)

Mortimer's individual tax returns further demonstrate his ownership in Family Practice.[5] Mortimer identified his income from Family Practice on his 2013 tax return as profit from a business or sole proprietorship. (Mortimer Dep. 87:8-88:25, Ex. 29, March 12, 2019) Mortimer

---

[5] Mortimer produced unsigned copies of his 2013, 2014, and 2015 individual income tax returns. He signed a release to allow Plaintiffs to seek his signed filed returns. The IRS could not produce such documents.

also represented on his 2013 tax returns that he "materially participated" in the operation of Family Practice. (Mortimer Dep. 88:3-89:14, Ex. 29, March 12, 2019)  On his 2015 income tax returns, Mortimer again reported his income from Family Practice as business profit, and represented that he "materially participated" in the operation of Family Practice.  (Mortimer Dep. 90:10 – 92:6, Ex. 30,  March 12, 2019) Mortimer represented on the business income forms in his tax returns that the money paid to him was not W-2 employee wages.   Mortimer Dep. 88:3-89:14, 90:10 – 92:6 Ex. 29, 30 March 12, 2019)  Instead, he reported on his tax returns that he was receiving income as an owner.

Mortimer's only defenses to the overwhelming evidence showing his ownership is that he claimed he was permitted to use Family Practice's debit card for personal items because he was owed back pay, made loans to Family Practice, his wife or businesses provided services to Family Practice, and he was taking cash out for Dr. Richard.  (Mortimer Dep. 108:6-112:7, March 12, 2019) Mortimer could not produce a single document to verify that he was owed "back pay," or made any "loans" to Family Practice. (Mortimer Dep. 108:6-112:7, March 12, 2019)  Mortimer could not produce any documents that evidence that the payments made to his wife or his other businesses were for services actually provided to Family Practice.  (Mortimer Dep. 48:6-54:5, Ex. 11-14, March 12, 2019)  Mortimer could not identify a single document that supported his assertion that he was taking out cash for Dr. Richard.  IN sum, Mortimer had no documents, no letters, no e-mails, no written agreements, no invoices, and no records to support any of his defenses.  Importantly, his tax returns are wholly inconsistent with his position in this litigation because he did not claim "back pay," loan interest income, or the significant cash

distributions to him or his wife. Simply put, Mortimer cannot provide any corroborating evidence to support his baseless statements.

Because Dr. Richard, the purported owner, never "wholly owned" Family Practice, the licensure exemption maintained by Family Practice was never valid. When applying the uncontroverted evidence in the current matter to the law directly on point, the record evidence clearly shows that Family Practice operated under a fraudulent ownership scheme similar to those in *Silver Star, Med. Serv. Ctr. Of Fla., Inc.,* and *First Care Solution*. No reasonable jury could ever find that Dr. Richard truthfully "wholly owned" Family Practice, and as such the licensure exemption maintained by Family Practice was never valid.

## 2. Family Practice's Licensure Exemption was invalid, and as such all charges submitted by Family Practice were unlawful.

Sections 627.730 - 627.7405, Florida Statutes, titled Florida's Motor Vehicle No-Fault Law (the "No-Fault Law") mandates that insurers are to provide up to $10,000.00 in PIP benefits to insured persons who are injured in automobile, and automobile related, accidents regardless of fault. The No-Fault Law also states that PIP benefits are "only payable for medical services and treatment that are … lawfully rendered." *See* § 627.736, Fla. Stat. (2012) Insurers are only required to pay for "services and care that are **lawfully provided**…" §627.736(1)(a)1, Fla. Stat. (2012) (emphasis added). Insurers are not required to pay for "any service or treatment that was not lawful at the time rendered." §627.736(5)(b)1.b., Fla. Stat. (2012). The term "lawful" or "lawfully" is defined in the No-Fault Law as "substantial compliance with all relevant applicable criminal, civil, and **administrative requirements of state and federal law related to the provision of medical services or treatment**." §627.732(11), Fla. Stat. (2012) (emphasis added).

16

The failure to comply with the licensing requirements of the HCCA renders the clinic's services unlawful and non-compensable. *See* § 400.9935(3), Fla. Stat. (2012); *Silver Star*, 739 F. 3d. at 582-584 (explaining that "lawfully provided" requires compliance with the HCCA's licensing requirements, which includes the "wholly owned" exemption); *State Farm Mut. Auto. Ins. Co. v. Altamonte Springs Diagnostic Imaging, Inc.,* 2011 WL 6450769 at *2-4 (M.D. Fla. Dec. 21, 2011) (finding that the violation of the HCCA's licensing requirements rendered all treatment and services unlawful and non-compensable); *Med. Serv. Ctr. Of Fla., Inc.,* 103 F. Supp. 3d. at 1353-54 (finding that clinic did not qualify for "wholly owned" exemption and therefore operated unlawfully); *First Care Solution, Inc.*, 232 F. Supp. 3d at 1267-68 (holding that a clinic that does not qualify for the "wholly owned" exemption, and does not otherwise hold a license, operates unlawfully).

Further, insurers are permitted to recover benefits paid to clinics operating without a proper license and in violation of the HCCA. *See Allstate Ins. Co. v. Vizcay,* 826 F. 3d 1326, 1330-31 (11th Cir. 2016) (holding that an insurer can recover payments made to a clinic that was operating in violation of the HCCA); *Silver Star*, 739 F. 3d at 582-84 (finding that State Farm was entitled to recover benefits paid to a clinic that was evading the licensure requirements of the HCCA); *Med. Serv. Ctr. Of Fla., Inc.,* 103 F. Supp. 3d. at 1354-56 (holding that State Farm was entitled to recover payments made for claims that it was statutorily entitled to deny based on clinic's unlawful ownership scheme).

Accordingly, because Dr. Richard did not wholly own Family Practice, Family Practice was not properly exempt from the HCCA's licensure requirements under § 400.9905(4)(g) (or otherwise), and all of Family Practice's treatment rendered to Plaintiffs' insureds is unlawful and

non-compensable. *See Silver Star,* 739 F. 3d. at 582-584; *Altamonte Springs Diagnostic Imaging, Inc.,* 2011 WL 6450769 at *2-4; *Med. Serv. Ctr. Of Fla., Inc.,* 103 F. Supp. 3d. at 1353-54; *First Care Solution, Inc*., 232 F. Supp. 3d at 1267-68. Under Florida Law, Plaintiffs are only obligated to pay PIP benefits for medical treatment that was lawfully provided. At all times, Family Practice operated in violation of the Licensing Act, the HCCA and the No Fault Law and so none of the services it rendered were compensable. Plaintiffs are, therefore, entitled to recover the amounts paid to Family Practice.

## II. STATE FARM MUTUAL AND STATE FARM FIRE ARE ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS.

The clear and undisputed evidence shows that Mortimer engaged in same type of licensure evasion scheme as in *Silver Star¸ Med. Serv. Ctr. Of Fla., Inc.,* and *First Care Solution*, thereby rendering all treatment and services provided by Family Practice unlawful, and entitling State Farm Mutual and State Farm Fire to recover all payments made to Family Practice.

### A. <u>State Farm Mutual and State Farm Fire are entitled to summary judgment on their common law fraud claim against Mortimer.</u>

State Farm Mutual and State Farm Fire are entitled to summary judgment on their Florida common law fraud claim against Mortimer. The elements of a common law fraud claim in Florida are: (1) making a false statement of fact; (2) known to be false by the person making the statement; (3) for the purpose of inducing another to act in reliance upon that statement; (4) an action taken by another in reliance upon the statement; and (5) damages resulting to the person(s) who relied on the statement. *Altamonte Springs Diagnostic Imaging, Inc*., 2011 WL 6450769 at *4 (citing *Gandy v. Trans World Computer Tech. Grp*., 787 So. 2d 116, 118 (Fla. 2d DCA 2001)).

The Florida No-Fault law states that insurers are not required to pay "to any person who knowingly submits a false or misleading statement relating to the claim or charges." §627.736(5)(b)1.c., Fla. Stat. (2012). The No-Fault law also provides that "no statement of medical services may include charges for medical services of a person or entity that performed such services without possessing the valid licenses required to perform such services." *See* §627.736(5)(d), Fla. Stat. (2012). Insurers are allowed to dispute the validity of a claim at any time, including after benefits have already been paid. *See* § 627.736(4)(b)6, Fla. Stat. (2012). As such, Plaintiffs are entitled to recover the amounts paid due to the Defendants' fraudulent conduct.

Family Practice, at the direction of Mortimer, knowingly made false statements of fact by submitting bills, reports, and other supporting documentation to State Farm Mutual and State Farm Fire for medical treatment or services that were unlawful. (Mortimer Dep. 112:20-114:13, Ex. 37, 38 March 12, 2019) Mortimer clearly knew that the statements were false because he knew Family Practice was not wholly owned by Dr. Richard. Mortimer submitted the bills and medical documents to State Farm Mutual and State Farm Fire for the purpose of inducing State Farm Mutual and State Farm Fire to make payments. (Mortimer Dep. 124:9-125:18, Ex. 38 March 12, 2019) Mortimer knew that State Farm Mutual and State Farm Fire would rely upon the bills, reports, and other supporting documentation, that he caused to be submitted, and issue payments to Family Practice. (Mortimer Dep. 112:20-114:13, Ex. 37, 38 March 12, 2019)

The bills, reports, and other supporting documentation caused State Farm Mutual and State Farm Fire to take action and issue payments to Family Practice under their Insureds' PIP and MPC coverages. It is undisputed that State Farm Mutual and State Farm Fire relied on the

bills and medical documents and extended $384,396.24 in payments through the date of filing suit to Family Practice for treatment purportedly rendered to the Insureds at issue in this case. (Dkt. 1-2, Ex. A-B; Mortimer Dep. 124:9-125:18, Ex. 38 March 12, 2019)    Therefore, the payments made by State Farm Mutual referenced in Exhibit "A" to the Complaint (Dkt. 1-2, Ex. A), and by State Farm Fire referenced in Exhibit "B" to the Complaint (Dkt. 1-2, Ex. B) were fraudulently obtained by Family Practice at the direction of Mortimer, and State Farm Mutual and State Farm Fire are entitled to summary judgment.

**B.      State Farm Mutual and State Farm Fire are entitled to summary judgment on their unjust enrichment claim against Mortimer.**

To satisfy the elements of a cause of action for unjust enrichment, State Farm Mutual and State Farm Fire "must show that: (1) plaintiff conferred a benefit on the defendant, who had knowledge thereof; (2) defendant voluntarily accepted and retained the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit." *Med. Serv. Ctr. Of Fla., Inc.,* 103 F. Supp. 3d. at 1355    When an insurer pays unlawful claims that it was statutorily entitled to deny, the elements of unjust enrichment have been satisfied and the insurer is entitled to recover the benefits.  *See Vizcay*, 826 F. 3d at 1330-32 (affirming the jury verdict in favor of insurer on unjust enrichment claim based on unlawfully operated healthcare clinic). Florida courts have recognized a cause of action for unjust enrichment for insurers to recover payments retained by clinics or persons for unlawfully rendered services.  *See Silver Star*, 739 F. 3d at 584.    State Farm Mutual and State Farm Fire are therefore legally entitled to recover all benefits paid to Mortimer and Family Practice as Family Practice operated without a valid license and all treatment rendered was unlawful. *See Silver Star*, 739 F. 3d at

584, 586; *Med. Serv. Ctr. Of Fla., Inc.,* 103 F. Supp. 3d. at 1355 (granting summary judgment for State Farm on unjust enrichment claim against unlawfully operated healthcare clinic that was not "wholly owned" by purported physician owner); *First Care Solution, Inc.*, 232 F. Supp. 3d at 12668 (granting summary judgment for State Farm on unjust enrichment claim against healthcare clinic that was not "wholly owned" by licensed medical professionals but rather owned by layperson); *Altamonte Springs Diagnostic Imaging, Inc.,* 2011 WL 6450769 at *5 (unjust enrichment is appropriate remedy where insurer did not bargain for unlawfully rendered medical services).

It is not disputed that Family Practice, at the direction of Mortimer, accepted and retained benefits in the form of payments from State Farm Mutual and State Farm Fire for unlawful and non-compensable treatment. State Farm Mutual and State Farm Fire, as a result of Mortimer's fraudulent actions, unknowingly conferred a benefit on Mortimer and Family Practice by making payments for medical services that State Farm Mutual and State Farm Fire were not obligated to pay. Mortimer admitted that he received a direct benefit from the payments made by State Farm Mutual and State Farm Fire. (Mortimer Dep.:10-13, March 12, 2019) Mortimer also confirmed that he retained the money that was paid to Family Practice by State Farm Mutual and State Farm Fire. (Mortimer Dep. 125:22-128:14, 133:10-13, Ex. 39, 40 March 12, 2019) Under the present circumstances, it would be inequitable for Mortimer to retain these benefits. As such, State Farm Mutual and State Farm Fire are entitled to recover all of the payments made to Family Practice directly from Mortimer. *See State Farm Fire and Cas. Co.. v. Silver Star Health and Rehab, Inc.*, 2011 WL 6338496, at *7 (M.D. Fla. Dec. 19, 2011) (finding that payments made to a defendant though a "pass through entity" are deemed a direct benefit in order to

support a claim for unjust enrichment); *State Farm Mut. Auto. Ins. Co. v. A&J Med. Ctr., Inc.*, 2015 WL 4387946, at \*4-5 (S.D. Fla. June 24, 2015) (finding that participants in scheme to evade HCCA requirements and unlawfully obtain PIP benefits are jointly and severally liable for full amount of benefits paid). Mortimer does not dispute any of the amounts in Exhibits "A" and "B" to the Complaint. Mortimer Dep. 124:9-125:18, Ex. 38 March 12, 2019)  State Farm Mutual and State Farm Fire are, therefore, entitled to summary judgment on their unjust enrichment claim against Mortimer.

**C.** **State Farm Mutual and State Farm Fire are entitled to summary judgment on their claim for declaratory relief.**

State Farm Mutual and State Farm Fire are also entitled to a declaration that they are not required to pay the outstanding amounts billed by Family Practice.  It is well settled that an "insurer may pursue a declaratory action which requires a determination of the existence or non-existence of a fact upon which the insurer's obligations under an insurance policy depend." *Nationwide Mut. Co. v. Ft. Myers Total Rehab Ctr., Inc.*, 657 F. Supp. 2d 1279, 1292-93 (M.D. Fla. 2009).  Florida courts have also held that an insurer is entitled to a determination that it is not required to pay a healthcare clinic the amount of outstanding bills that were not lawfully rendered.  *See Silver Star*, 739 F. 3d 579 at 584 (affirming verdict on declaratory action finding that insurer was not required to pay outstanding bills submitted by clinic that was not properly licensed); *Med. Serv. Ctr. Of Fla., Inc.,* 103 F. Supp. 3d. at 1356 (granting summary judgment for State Farm on declaratory judgment and finding that State Farm was not required to pay outstanding bills submitted by clinic that was not "wholly owned" and was operating in violation of the HCCA licensing requirements); *Vizcay*, 826 F. 3d at 1332 (affirming jury verdict that

insurer was entitled to declaratory judgment that it was not required to pay outstanding amounts billed by clinic for unlawful and non-compensable treatment).

Here, there is no issue of material fact and the services billed by Family Practice were not ever lawful or compensable due to the scheme by Mortimer to evade the licensing requirements of the HCCA. Accordingly, since none of the services billed by Family Practice were lawful, State Farm Mutual and State Farm Fire are entitled to a declaratory judgment finding that they are not required to pay any outstanding bills submitted by, or demands made by, Family Practice.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant its Motion for Final Summary Judgment against Mortimer on its claims for common law fraud, unjust enrichment, and declaratory relief. Plaintiffs further request that the Court enter judgment against Mortimer for all damages due and owing to Plaintiff, plus applicable interest, award costs; and that the Court grant any other relief to Plaintiffs that the Court deems necessary.

Dated: April 29, 2019.

Respectfully submitted,

 /s/ Bart R. Valdes
BART R. VALDES (Trial Counsel)
Florida Bar Number 323380
CAMERON S. FRYE
Florida Bar Number 105142
de Beaubien, Simmons, Knight,
 Mantzaris & Neal, LLP
609 West Horatio Street
Tampa, Florida 33606
Telephone: (813) 251-5825
Facsimile: (813) 254-1063
bvaldes@dsklawgroup.com

cfrye@dsklawgroup.com

KENNETH P. HAZOURI
Florida Bar Number 19800
de Beaubien, Simmons, Knight,
  Mantzaris & Neal, LLP
332 North Magnolia Avenue
Orlando, Florida 32801
Telephone: (407) 422-2454
Facsimile: (407) 849-1845
khazouri@dsklawgroup.com
Attorneys for Plaintiffs

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically furnished through the CM/ECF filing system to Eric P. Larue, II, Esq., The LaRue Firm, 1350 Orange Ave., Suite 228, Winter Park, FL 32789, on this 29th day of April, 2019.

 /s/ Cameron S. Frye
CAMERON S. FRYE
Florida Bar Number 105142