UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE AND CASUALTY COMPANY,**

Plaintiffs,

v.

Case No: 6:18-cv-223-Orl-28LRH

**FAMILY PRACTICE AND REHAB, INC. and GILSON MORTIMER,**

Defendants.

# ORDER

State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire") (collectively "State Farm") bring the instant action for fraud, unjust enrichment, and declaratory judgment against Family Practice and Rehab, Inc. ("Family Practice") and Gilson Mortimer.[1] State Farm now moves for summary judgment against Gilson Mortimer. (Doc. 36).[2] As set forth below, State Farm's motion is granted in part and denied in part.

**I. Background**

Health care clinics operating in Florida are required to be licensed by the Agency for Health Care Administration ("AHCA") unless they qualify for an exemption. Fla. Stat. § 400.991 (2012). A clinic does not lawfully provide services if it does so without obtaining

---

[1] This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). (Compl., Doc. 1, at 1–2).
[2] Mortimer filed a Response (Doc. 44) to the motion.

required licenses or meeting the standards for an exemption. Section 400.9905(4)(g), Florida Statutes, provides an exemption for clinics that are "wholly owned by one or more licensed health care practitioners . . . if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws." A Florida statute pertaining to personal injury protection ("PIP") benefits also provides exemptions to licensing requirements for entities "wholly owned" by a physician licensed under chapters 458 or 459, or by a chiropractic physician licensed under chapter 60. Id. § 627.736(5)(h). "An insurer or insured is not required to pay a claim or charges . . . for any service or treatment that was not lawful at the time rendered [or] [t]o any person who knowingly submits a false or misleading statement relating to the claim or charges." Id. § 627.736(b)(1).

Family Practice was incorporated in Florida in March 2012 with Dr. Charles Richard—a doctor of osteopathic medicine—as the corporation's president and Mortimer—a non-physician—as its vice president.[3] (Mortimer Dep. Ex. 2).[4] Family Practice operated as a chiropractic clinic in Orlando, Florida, until 2015, when it was dissolved. (Mortimer Dep. at 20, 116; Richard Decl. at 3). Family Practice was not licensed by AHCA, instead asserting entitlement to an exemption based on Dr. Richard's purported whole ownership of the clinic.

State Farm Mutual and State Farm Fire are insurers who routinely pay medical providers for services rendered to their insureds under PIP policies. While Family Practice

---

[3] Fritz A. Nicolas was listed as the secretary, but he has not been implicated in this case.

[4] Mortimer's deposition and corresponding exhibits, as well as the other exhibits to State Farm's motion, are filed as Docs. 36-1 through 36-9. Citations are to deposition page numbers rather than to page numbers in the electronic record.

was in operation, State Farm Mutual paid $377,846.72 and State Farm Fire paid $6,549.52 to Family Practice for such services. (Mortimer Dep. at 125). In this lawsuit, State Farm claims that Mortimer was an owner of Family Practice and that therefore Family Practice was not exempt from AHCA licensure under Florida law. State Farm thus contends that it had—and has—no obligation to pay Family Practice, and State Farm seeks to recover the sums that it did pay. State Farm further asserts that because Mortimer admitted to retaining the benefits from State Farm's payments to Family Practice, State Farm may recover all payments from Mortimer directly.[5]

## II. Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the

---

[5] Family Practice did not respond to State Farm's Complaint, and the Clerk entered a default against Family Practice. (Doc. 16). State Farm then moved for default final judgment, (Doc. 24), and the assigned magistrate judge denied the motion without prejudice, (Doc. 25), allowing State Farm to refile the motion after the case against Mortimer is resolved. State Farm brings the current motion for summary judgment only as to Mortimer.

matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

"'[J]udges [are not] required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party . . . . [I]n every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" Id. at 251 (quoting Improvement Co. v. Munson, 14 Wall. 442, 448 (1872)). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52. Summary judgment may be granted if no "reasonable jury could return a verdict for the nonmoving party." Id. at 248.

III. **Discussion**

A. **"Wholly Owned"**

State Farm argues that it is entitled to summary judgment on the question of ownership of the clinic because there is no genuine issue of material fact as to whether Family Practice was "wholly owned" by one or more licensed health care practitioners. The record evidence establishes that State Farm is correct. Mortimer—who claims to have been the Family Practice office manager—admits that there are no texts, emails, documents, or other forms of records to substantiate any of his assertions of non-ownership. Mortimer's evidence against ownership is his own deposition testimony, which is riddled with contradictory statements and evasive answers. Further, Mortimer's

4

deposition directly contradicts his answers to interrogatories on many issues. Even viewing Mortimer's statements and their discrepancies in the light most favorable to him, as the Court must, there is not evidence of a "sufficient disagreement to require submission to the jury" on the issue of ownership. Anderson, 477 U.S. at 251–52.

State Farm does not need to show that Mortimer was the sole owner of Family Practice in order to prove that the clinic was providing services unlawfully. State Farm only needs to show that Mortimer—or another non-physician—was, in reality, a partial owner of Family Practice such that Dr. Richard—a physician—was not the sole owner. State Farm has done so.

Section 627.732(17), Florida Statutes, defines "entity wholly owned" to mean an entity "in which licensed health care practitioners are the business owners of all aspects of the business entity, including, but not limited to, being reflected as the business owners on the title or lease of the physical facility, filing taxes as the business owners, being account holders on the entity's bank account, being listed as the principals on all incorporation documents required by this state, and having ultimate authority over all personnel and compensation decisions relating to the entity." Courts have provided additional factors to aid in determining whether an entity is "wholly owned" by licensed health care practitioners, including financial factors such as whether a non-physician signed company checks, used company checks and debit cards for personal expenses, wrote company checks to themselves and family members, withdrew cash from business accounts for personal use, directed payments to other businesses that the individual owned or their businesses' vendors, or had the company pay for a personal vehicle. See State Farm Mut. Auto. Ins.

Co. v. First Care Sol., Inc., 232 F. Supp. 3d 1257, 1263–67 (S.D. Fla. 2017); State Farm Mut. Auto Ins. Co. v. Med. Serv. Ctr. of Fla., 103 F. Supp. 3d 1343, 1351–53 (S.D. Fla. 2015).

Other factors that courts have considered relate to incorporation and corporate control, such as whether a non-physician: made capital investments in the entity, received profits or suffered losses, had the ability to sell or dissolve the business, had authority to retain and direct the activities of attorneys, hired the company's accountants, participated in the preparation and filing of tax returns, owned equipment in the facility, handled the winding up of the business and storage of equipment and patient records, or actively participated in management and control of the business. See State Farm Fire & Cas. Co. v. Silver Star Health & Rehab, 739 F.3d 579, 585 (11th Cir. 2013); First Care, 232 F. Supp. 3d at 1263–67; Med. Serv. Ctr., 103 F. Supp. 3d at 1351–53. Additionally, courts have listed factors more related to the management of daily clinic activities, such as whether a non-physician: possessed keys and alarm codes for the facility, was responsible for vendor bills, was involved in day-to-day operational activities, determined amounts billed to insurers, controlled payroll, maintained patient records, or dictated office policies and decisions pertaining to pricing, advertising, and personnel. See Silver Star, 739 F.3d at 585; Med. Serv. Ctr., 103 F. Supp. 3d at 1351–53; First Care, 232 F. Supp. 3d at 1263–67.

### 1.     Financial Control

Perhaps most indicative of Mortimer's ownership of Family Practice is his use and control of the finances of the business. As described in more detail below, Mortimer (1) was a signer on the clinic's bank account, (2) used company checks and debit cards for personal expenses, (3) wrote company checks to himself and family members, (4)

withdrew cash for personal use, (5) directed payments to other businesses that he owned and those businesses' vendors, and (6) had the company pay for his personal vehicle.

Mortimer claims Family Practice had no bookkeeping system and that he kept no payroll or other financial records relating to Family Practice's obligations to him, his wife,[6] or his other personal businesses. (Mortimer Dep. at 54, 72–79, 92–93). Yet he paid himself, his wife, and at least four of his other personal businesses large sums of money that he states were for backpay, repayment of his loans to the business, and services rendered by his other businesses. He does not dispute that he used Family Practice's bank account to withdraw $62,139.50, spend $113,661.26 in debit card transactions, write $37,500 in checks to himself and his personal entities, and pay $64,538.48 to his wife. (Id. at 126–29). He even directly paid vendors to whom his personal businesses—unrelated to Family Practice—owed money. (Id. at 96–99). On the other hand, Dr. Richard avers he never signed any checks on behalf of the clinic,[7] (Richard Decl. at 2), and Dr. Richard's total withdrawals from the clinic's bank account were $15,788.15; total debit card transactions were $23,912.12; and total check payments were $12,000, including all payment for services he rendered as a chiropractor at the clinic. (Mortimer Dep. Ex. 39).

There are also $1,235,156.53 in unspecified withdrawals that Mortimer does not have accountings for; he claims he gave money to Dr. Richard because Dr. Richard was going through a divorce and did not want the funds tracked back to him. (Mortimer Dep. at

---

[6] Mortimer stated in his deposition that his wife did some work for the clinic, but he said there was no calculation for how he made the payments to her from Family Practice. (Mortimer Dep. at 46–56). He later also stated that some of the payments to her were actually for undocumented backpay owed to him. (Id.). In 2015, Dr. Richard received less W-2 pay from Family Practice than Mortimer's wife did. (Id. at 48).

[7] Mortimer does not refute these assertions made by Dr. Richard in his declaration.

7

127). Oddly, this account of events is first introduced by Mortimer at the very end of his deposition. (Id.)

Mortimer repeatedly used Family Practice's bank account to pay for personal expenses, including the down payment on his Land Rover. (Id. at 94). He used his Family Practice debit card to make personal purchases at places like Red Lobster, Advance Auto Parts, Victoria's Secret, Guess, Publix, Burlington, Armani Exchange, and several hotels. (Id. at 105–10). After reviewing bank records showing charges at Publix and other entities, Mortimer was asked:

> Q: And then towards the bottom of the page, there's a charge on your account for Victoria's Secret; correct?
> A: Correct.
> Q: And those are all for personal or household transactions; correct?
> A: No.
> Q: What business purpose did you have for a purchase at Victoria's Secret on your business card?
> A: None.

(Id. at 106–07). Mortimer later explained:

> A: . . . Any time I used the card, you know, it's either I didn't get paid my full pay, and I used it for my personal use, and Dr. Richard authorized me to use it.
> Q: All right. Any documentation to evidence that Dr. Richard authorized you to use your ATM card for personal, non-business purchases?
> A: There is no document besides him adding me on to the account.

(Id. at 108). Even if Mortimer's statements are taken as true regarding Dr. Richard's consent and the payments being reimbursement for amounts owed to him, the fact that Mortimer had the ability to do these things is overwhelming evidence of his exercise of control over Family Practice's finances. Cf. Eckhardt v. United States, 463 F. App'x 852, 856–57 (11th Cir. 2012) (discussing similar personal uses of funds as clear evidence of dominance and control in the context of alter ego liability).

Mortimer's control is further evident in his use of the Family Practice bank account to make wire transfers totaling roughly $59,000 for his personal purchase of a commercial property. (Mortimer Dep. at 81–84). Mortimer then proceeded to lease the property to commercial tenants for personal gain. (Id.) He also used the Family Practice bank account to pay a man to do work on his new, personal rental property. (Id. at 101–02).

### 2. Incorporation and Corporate Control

There is also clear evidence of Mortimer's involvement in the clinic's incorporation and his exercise of corporate control, including Mortimer's: (1) being listed as the vice president on incorporation documents; (2) handling many of the clinic startup tasks, such as hiring employees and obtaining equipment; (3) filing income tax returns as a business owner, including listing profits and losses attributable to the clinic; (4) handling the preparation and filing of the clinic's taxes, as well as using the same accountant to file his personal and the clinic's tax returns; (5) handling the winding up of the business after dissolution; and (6) maintaining possession of the clinic's equipment and patient records well after dissolution.

Mortimer claims that he did not work for Family Practice until January or February 2013, but he is listed in the Articles of Incorporation as the vice president in 2012, (Mortimer Dep. at 21, 28–29); assisted with licensing in 2012, (id. at 33); became a signer on the clinic bank account and began writing and signing checks starting with the first check in June 2012, (id. at 36); and is named on the IRS's letter requesting Family Practice's EIN dated January 4, 2013, (id. at 112–13). Mortimer also arranged for equipment to be delivered to the clinic, for computers and furniture to be set up, and for the hiring of employees. (Id. at 33). Although not named on the lease, Mortimer participated in finding

the clinic location and negotiating the lease. (Id. at 22, 121). Mortimer arranged for any insurance coverages needed by Family Practice, (id. at 35–36), and although he claims not to have known he was an officer of the company, (id. at 28–29), he signed at least one insurance application as an owner/officer in February 2013, (id. at 34–36; Mortimer Dep. Ex. 7). Thus, although he claims not to have been an owner or employee, he was clearly thoroughly involved in the clinic at the time of incorporation and setup.

Mortimer asserts that when he was officially hired, his title at Family Practice was "office manager." However, he has no idea about basic recordkeeping practices. For example, although there is no documentation of it, Mortimer claims that he personally made loans to the clinic. (Mortimer Dep. at 25–26, 28). These loans, he says, were after the business was already started, not for start-up costs. (Id.). Mortimer testified that only Dr. Richard contributed money to start the business, but Mortimer has no documentation of this and is indecisive on how he obtained this knowledge and how the money was contributed:

> Q: So going back to the initial capital that was necessary for Family Practice, where did that money come from, the initial money that you needed to start Family Practice?
> A: I didn't start Family Practice.
> Q: The money that was needed to start Family Practice, where did it come from?
> A: Dr. Richard.
> . . . .
> Q: All right. How do you know that money came from him individually?
> A: Because I know he did it.
> Q: You saw the checks?
> A: Yes.
> Q: You saw the checks that he wrote?
> A: I don't remember exactly, you know, how it - - I don't remember everything.

(Id. at 23–24, 26–28).

During the relevant time period, Mortimer claimed income, expenses, and net profits and losses from Family Practice on his federal income tax returns as coming from a business that he "materially participated in the operation of" rather than as W-2 wages. (Id. at 87–92). Dr. Richard, on the other hand, claims he never paid any taxes for Family Practice.[8] (Richard Decl. at 2). Mortimer used the same person to prepare his personal tax forms and Family Practice's tax forms, (Mortimer Dep. at 84), and, according to Dr. Richard, Mortimer changed Family Practice's accountant without Dr. Richard's knowledge.[9] (Richard Decl. at 2).

Mortimer also handled the winding up of the business. Although Mortimer claims that he did not own the equipment, furniture, or computers in the clinic, upon dissolution of Family Practice he moved everything into storage, where it remained at the time of his deposition. (Mortimer Dep. at 118). He also still had the patient records in storage at the time of his deposition. (Id. at 120). After dissolution, he helped another physician who worked at Family Practice set up a chiropractic clinic called "Family Wellness" at the same location with the same employees. (Id. at 117–20). He also continued to approve lingering Family Practice litigation settlements and sign checks—including checks to himself, his wife, and his other personal businesses. (Id. at 54–55, 64–65).

### 3. Daily Management

The record evidence also shows that Mortimer participated heavily in the daily management of Family Practice. Mortimer admittedly (1) ran day-to-day operations; (2)

---

[8] Mortimer did not refute these assertions made by Dr. Richard in his declaration.
[9] Mortimer admits in his deposition that Family Practice changed accountants—without specifying who made the change, (Mortimer Dep. at 84–85)—and he does not refute Dr. Richard's statement in any other way.

managed personnel matters; (3) handled advertising and other primary office decisions; (4) was responsible for vendor bills; (5) coordinated billing to insurers and payments received from insurers; and (6) possessed keys and alarm codes for the clinic.

Although Dr. Richard was the president of Family Practice, he only visited the clinic a few days per month. (Mortimer Dep. at 34; Richard Decl. at 1). Conversely, Mortimer was at the clinic every day and handled the day-to-day operations, including marketing, hiring and scheduling employees, treating patients,[10] managing payroll, paying the rent, handling building issues with the landlord, coordinating and paying vendors, arranging for equipment to be serviced, maintaining patient records, and obtaining supplies. (Mortimer Dep. at 32–35, 39–43). Mortimer also contracted with a billing company for an arrangement whereby he sent the medical records to the company, the company billed the insurers, and Mortimer deposited the checks from the insurers. (Id. at 112–15). Mortimer had keys to the office and knew the alarm code, (id. at 32), while Dr. Richard, the supposed sole owner, did not have a key to the clinic or know the alarm code, (Richard Decl. at 2).[11]

### 4. Mortimer Was an Owner of Family Practice

Considering the factors identified by the Florida statute and courts, these admissions from Mortimer and other evidence indicate that Mortimer was an owner of Family Practice. Given this overwhelming evidence of ownership and the lack of evidence to the contrary, no reasonable jury could find that Mortimer was not a partial owner of Family Practice. See Anderson, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)). State Farm has thus established that Family Practice was not exempt from

---

[10] Mortimer was certified as a chiropractic assistant. (Mortimer Dep. at 11).
[11] Mortimer did not refute these assertions made by Dr. Richard in his declaration.

licensure and therefore was not lawfully entitled to payments from State Farm. Accordingly, the Court now turns to State Farm's claims for fraud, unjust enrichment, and declaratory judgment.

**B. Claims**

**1. Fraud**

The Court finds that there are genuine issues of material fact as to whether Mortimer committed common law fraud. "The 'essential elements' of common law fraud under Florida law are: (1) a false statement of fact; (2) known by the person making the statement to be false at the time it was made; (3) made for the purpose of inducing another to act in reliance thereon; (4) action by the other person in reliance on the correctness of the statement; and (5) resulting damage to the other person." State Farm Mut. Auto. Ins. Co. v. Altamonte Springs Diagnostic Imaging, Inc., No. 6:11-cv-1373-Orl-31GJK, 2011 U.S. Dist. LEXIS 146926, at *9 (M.D. Fla. Dec. 21, 2011) (citing Gandy v. Trans World Computer Tech. Grp., 787 So. 2d 116, 118 (Fla. 2d DCA 2001)). Florida law also provides that insurers are not required to pay "any person who knowingly submits a false or misleading statement relating to the claim or charges." Fla. Stat. § 627.736(5)(b)1.c. (2012). The same part of the statute prohibits billing insurers for medical services provided by an entity that was not properly licensed to perform the services. Id. § 627.736(5)(d) (2012).

Mortimer coordinated Family Practice's billing from initially contracting with the billing company through depositing the insurer checks. The bills were submitted to induce State Farm to rely on their accuracy and pay for the services—which they did. State Farm had no legal obligation to do so and, thus, suffered damages. However, there are genuine issues of fact as to whether Mortimer *knowingly* made a false statement of fact. Although

13

it is clear from the record evidence that Mortimer was a partial owner, State Farm has not clearly established that he knew he was violating the statute. Accordingly, summary judgment is not appropriate on State Farm's claim for common law fraud.

### 2. Unjust Enrichment

State Farm also argues that it is entitled to recover payments made to Mortimer and Family Practice under a theory of unjust enrichment. "[T]o establish the elements of a cause of action for unjust enrichment, State Farm must show that: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." Med. Serv. Ctr., 103 F. Supp. 3d at 1355.

Charges for services rendered by clinics not properly licensed are "unlawful charge[s] and [are] noncompensable and unenforceable." Fla. Stat. § 400.9935(3); see Silver Star, 739 F.3d at 583. Courts have recognized a cause of action for unjust enrichment to allow insurers to recover payments made for these unlawful charges. See Silver Star, 739 F.3d at 584–86; Med. Serv. Ctr., 103 F. Supp. 3d at 1355. "If [State Farm] showed that the [clinic was] in fact operating in violation of the Clinic Act, then it was entitled to recover the amounts it paid to the clinic[ ] . . . ." Allstate Ins. Co. v. Vizcay, 823 F.3d 1326, 1330 (11th Cir. 2016).

Mortimer admitted that he retained a direct benefit from State Farm's payments to Family Practice. (Mortimer Dep. at 133). These payments were for unlawful charges that were "noncompensable and unenforceable." Therefore, it would be unjust to allow

14

Mortimer to retain these benefits. The Court concludes that State Farm is entitled to summary judgment on the issue of liability on its claim for unjust enrichment.

### 3. Declaratory Judgment

Courts have recognized a declaratory cause of action for insurers when there are pending payments due for services unlawfully rendered. See Silver Star, 739 F.3d at 584; Med. Serv. Ctr., 103 F. Supp. 3d at 1355–56. However, State Farm brought its claim for a declaratory judgment against only Family Practice; whereas, State Farm is now moving for summary judgment against only Mortimer. As such, entry of a declaratory judgment in this Order is not proper.

### C. Damages

Although State Farm is entitled to damages, there are genuine issues of material fact as to the amount of damages attributable to Mortimer. Although Mortimer admitted to directly benefiting from the payments made by State Farm, it is unclear that he should be held jointly and severally liable for the full value of payments conferred to Family Practice. Thus, the amount of damages to which State Farm is entitled remains an issue for trial.

### IV. Conclusion

It is hereby **ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 36) is **DENIED IN PART** and **GRANTED IN PART**. The motion is **DENIED** as to Counts I & 3 and is **GRANTED** as to liability on Count II.

**DONE** and **ORDERED** in Orlando, Florida, on September 16, 2019.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties

15